**CENTRAL BUFFALO PROJECT CORPORATION, Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Empire of America Federal Savings Bank; Federal Deposit Insurance Corporation, as Receiver of Empire Federal Savings Bank of America; and Federal Deposit Insurance Corporation, as Manager for the FSLIC Resolution Fund, Defendants.**

No. 91–CV–824C(M).

United States District Court, W.D. New York.

Nov. 24, 1998.

Falk & Siemer (Alvin M. Glick, Donald McGrath, Stephen Szymoniak, of Counsel), Buffalo, NY, for Plaintiff.

Saperston & Day (Charles C. Swanekamp, James P. Domagalski, of Counsel), Buffalo, NY, for Defendants.

## DECISION and ORDER

CURTIN, District Judge.

### STATEMENT OF THE CASE

Plaintiff, Central Buffalo Project Corporation ("Central Buffalo"), commenced this action against defendant Resolution Trust Corporation ("RTC") as an individual corporation, as receiver of Empire of America Federal Savings Bank ("Old Empire"), and as receiver of Empire Federal Savings Bank of America ("New Empire"). Plaintiff alleges that the RTC failed to repudiate five leases between Old Empire and Central Buffalo within a "reasonable period," as di-

rected by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1821(e). The trial of this action was bifurcated. The liability portion of the trial was held from July 12 through July 23, 1997. Both sides have submitted post-trial memoranda of law, and summations were heard on May 8, 1998. Plaintiff contends that the RTC failed to repudiate the leases within a "reasonable period," while the RTC claims that it repudiated the leases within a "reasonable period." During the trial, the court also heard testimony about the real estate market in downtown Buffalo, which relates to the question of damages.

### STATEMENT OF FACTS

On January 24, 1990, the Office of Thrift Supervision ("OTS") appointed the RTC conservator of Old Empire. On February 27, 1990, the OTS appointed the RTC as the receiver for Old Empire. A receiver winds up the bank's affairs, while a conservator attempts to restore the bank to viability. On February 28, 1990, New Empire was chartered and purchased the assets of Old Empire. That same day, OTS appointed the RTC as conservator of New Empire. Approximately one month later, on March 23, 1990, the RTC notified Central Buffalo that all five of the subject leases were being assigned to New Empire.

On September 28, 1990, OTS appointed the RTC as receiver for New Empire. As a result of its appointments by the OTS, the RTC, by operation of law, succeeded to all rights, title, powers, and privileges of Old Empire and New Empire. Included in the assets of New Empire were the five leases between Old Empire and plaintiff Central Buffalo. Central Buffalo was a wholly owned subsidiary of Hammerson PLC, a real estate holding company based in London, England. It owned the property known as the Main Place Mall in downtown Buffalo, which included the banking premises and offices with which we are now concerned. The leases, which were all long-term, extending into the 21st century, constituted the entire leasehold space rented by Old Empire from Central Buffalo and comprised approximately 217,000

square feet of space. The description of the five leases is as follows:

(a) The November 3, 1966, lease expired on June 30, 2019. The lease consisted of 85,000 square feet in the three-story structure; 23,500 square feet on the fifth and sixth floors; 5,540 square feet in the third floor cafeteria and dining areas; and 22,000 square feet in the basement.

(b) The June 15, 1968, lease expired June 30, 2019. It consisted of 4,363 square feet on the third floor over Main Place Mall.

(c) The June 3, 1982, lease expired June 30, 2019. The lease consisted of 2,190 square feet in the mezzanine area.

(d) The August 21, 1984, lease expired December 31, 1994. It consisted of 38,301 square feet on the third floor area over Main Place Mall on the Pearl Street side.

(e) The March 27, 1985, lease also expired December 31, 1994. It consisted of 36,462 square feet on the third floor over Main Place Mall on the Main Street side.

On September 28, 1990, the same day that he RTC was appointed as receiver for New Empire, Key Interim Savings Bank FSB of New York ("Key Bank") entered into a purchase and assumption agreement with the RTC which gave Key Bank 90 days to accept assignment of any or all of the five subject leases. Manufacturers and Traders Trust Company ("M & T Bank") was a party to a separate agreement with Key Bank for the purchase of certain assets of the Institution. Subject to this agreement with Key Bank, M & T Bank also had ninety (90) days from September 28, 1990, to accept or put back (i.e., repudiate) the leases.

On December 17, 1990, M & T advised the RTC that it was not interested in accepting the assignment of the leases; and on December 20, 1990, Key Bank advised the RTC that it also had no interest in the leases.[1] On March 28, 1991, the RTC, as receiver, repudiated the leases effective June 1, 1991, and pre-paid rent to Central Buffalo until June 1, 1991. The decision to repudiate the leases was made 181 days after the RTC's appoint-ment as receiver of New Empire. This also was approximately 101 days after the RTC learned that M & T Bank would not be interested in the leases, approximately 98 days after the RTC learned that Key Bank would not be interested in the leases, and approximately 91 days after the expiration of the period within which the banks were to exercise their option to assume the leases.

When the RTC was terminated on December 31, 1995, its assets and liabilities were transferred to the Federal Deposit Insurance Corporation ("FDIC"), which serves as manager of the FSLIC Resolution Fund. The FDIC succeeded the RTC as receiver of the Institutions.

This lawsuit came about as the result of FIRREA, P.L. No. 101–73, 103 Stat. 183 (1989), which was enacted to address the serious financial circumstances of numerous failed savings and loan institutions throughout the country. It was emergency legislation designed to stop the financial hemorrhaging of the federal budget caused by the savings and loan crisis. In enacting FIRREA, Congress granted the RTC the power to disaffirm or repudiate leases within a reasonable period of time if the RTC found them to be burdensome. Congress, however, did not define what constituted a "reasonable period" within which to repudiate.

The RTC asserts that the its decision to repudiate the leases was reasonable in light of circumstances involved in this takeover. Before the takeover, Empire was doing business in Michigan, Florida, Texas, and New York. The RTC sold the Texas operations to Bank One, the Michigan operations to CoAmerica, the Florida operations to Barnett Bank, and the New York operations to Key Bank and M & T. In support of its position that the repudiation was made within a reasonable time, the RTC asserts that the liquidation of Empire by the RTC was the largest and most complex undertaken by the RTC relating to a failed thrift at the time; the RTC was dealing with multiple acquirers and was responsible for segregating and transfer-

---

1. Plaintiff states that M & T and Key Bank faxed letters to the RTC on December 17, 1990 and December 20, 1990, but the RTC contends that it did not receive the letters in the mail until a few days later.

ring the assets of Empire to these acquirers throughout the country and Key Bank was unwilling to perform the traditional lead acquirer responsibilities. Key Bank refused to assume these duties because it was concerned that given the number of acquirers and the size of Empire's financial empire and depositor base, Key could not be confident that all of the financial documents and accounts in the large Empire account could be properly distributed to all the acquirers.

For these reasons the RTC contends that it was required to perform the functions of the traditional lead acquirer and handle the deconversion of Empire assets to the acquiring institutions along with maintaining functions such as the handling of payroll processing for the dedicated employees, maintaining their benefits, and handling all the data processing and ledger work necessary to maintain the integrity of the accounts. The RTC had to ensure that all of the financial documents would go through one central account and then to the correct acquirer account. Much of this work had to be done manually.

The RTC notes that generally in the late 1980s and early 1990s, the banking climate was in a serious and legitimate crisis. RTC employees working out of the Empire premises were also involved in a number of other bank receiverships and conservatorships throughout the Northeast United States. The RTC argues that this made it difficult for RTC personnel on-site in Buffalo to estimate how long it was going to take to conclude the Empire resolution. It was essential that depositors' security be protected and that the taxpayers recover as much financial remuneration as possible.

At that time, a typical deconversion took about four to six months to complete. But the RTC argues that it would have been impossible to run multiple deconversions for each of the acquiring banks simultaneously, given the complexity of the transactions and the technical capabilities on-site. However, four of the five deconversions, Bank One, Barnett Bank, M & T Bank, and Key Bank, all occurred in the first quarter of 1991.

According to the RTC, the deconversion of Empire involved an enormous number of complicated tasks including: making sure depositors were notified in a timely fashion; insuring that the acquirer understood how the products it was acquiring function; allowing the acquirer to identify what differences would exist between their own accounts and the accounts that they were acquiring; producing a number of reports to support the conversion of assets; preparing the files so that they could ultimately be transferred without error; and allowing the acquirers to communicate with their new customers.

The RTC notes that more than 100,000 depositors were affected by the deconversions. During the process, Empire was still functioning as a bank. Therefore, not only was the RTC attempting to deconvert over twelve billion dollars worth of assets to the acquiring institutions, it also was charged with running a large bank. For example, the RTC was still responsible for processing all automated clearing house transactions, such as automatic Social Security payments, annuity payments, and other electronically triggered payments, such as insurance bills, gas bills, and the like.

As part of the conversion, Empire's general ledger and recorded accounts, including cash, land, various loans, and receivable accounts, were broken down and rolled up into separate reports by individual cost centers. For example, the acquirer of the Michigan branches and deposits was separated from the general ledger and reported on separately. The same occurred for the New York branches, the Florida branches, and the Texas branches. During the first quarter of 1991, the RTC had an accounting staff and a treasury staff to sort through the accounts of the five acquirers and distribute the funds to each one of the acquirers, while retaining the individual general ledger so that all accounts would be kept in balance.

The RTC argues that in order to deal with this extensive process, it needed to utilize the personnel, computers, and files of the former Empire Bank which were on location at the leased premises. To do this work, the RTC retained personnel of the former bank who are described as dedicated employees of the RTC. The RTC argues that attempting to move the operations from the leased

premises during the deconversion would have delayed the deconversions, jeopardized the acquirers' purchased franchises, and endangered depositor's accounts. It argues that any disruption to service for depositors, many of whom were already concerned about the liquidity of Empire, could have caused a run on the bank.

In doing the deconversion, the RTC argues that it could not afford downtime. Shifting computers off-line could have temporarily jeopardized the consummation of the purchase agreement with the acquirers. The computers on-site at the leased premises were connected with a local area network ("LAN") and with the Commerce Drive suburban site of Empire, where most of the accounting and computer activity took place. It was essential that these connections remained in place without disruption during the deconversion process. According to the RTC, moving the computers at the leased premises would have required removing and reinstalling an entire LAN network. If the LANs had been moved from the leased premises to another location, a debugging period would be necessary that would occur with potential disruptions and lost information.

The RTC contends that it was difficult to maintain the dedicated employees working on the deconversion as these individuals would leave when an opportunity for permanent positions would arise with either the acquiring institutions or another bank. It was impossible to replace these employees. Those leaving were familiar with the files while a new employee would not be, and under the circumstances no one capable wanted to stay or come to work there for a short period if they had opportunity elsewhere.

The RTC contends that the dedicated employees were working throughout most of the leased areas during the first part of 1991 as part of liquidation. The RTC estimated that the number of employees working on-site at the leased premises varied between a high of 300 people to a low of about 100. The RTC, however, failed to offer any records in support of this estimate. To the contrary, plaintiff asserts that the majority of the dedicated

employees were housed at Empire's Amherst location on Commerce Drive in the Data Processing Center. Several former RTC employees testified that most of the functions were undertaken at the Commerce Drive site, not at Main Place. In contrast to the RTC's assertion that employees were working throughout the leased areas, plaintiff contends that soon after the September 28, 1990 resolution, substantially all of the space was vacated except for some operations on the third floor Main Street area and third floor Pearl Street side, with five or six people in the executive offices. M & T, which operated the branch banking floor of the former Empire for a time in 1990, closed its operations in Main Place in the latter part of January, 1991 and moved across the street to One M & T Plaza. Transcript ("Tr.") at 856.

The RTC insists that there were other reasons which required a delay in the issuance of the repudiation notice. Voluminous files and file cabinets used during the conversion were stored on-site at Empire. The Accounting Department would have been significantly disrupted had it been forced to move its operations. There was a danger of the possible loss of records endangering the balance of the transactions and customer security. It was also not feasible to immediately remove the furniture and fixtures that had been obtained by the acquirers or needed to be auctioned by the RTC. To liquidate that quantity of furniture in a commercially reasonable manner would have required marketing and moving time. The Empire property put up for auction was first appraised during February through April of 1991 and was later disposed of at a public auction held on the premises in June or July of 1991. The bank branch in the leased premises was not closed until January of 1991, and some safety deposit boxes were not removed until sometime after January of 1991.

Plaintiff contends that the RTC knew unequivocally upon receipt of notice from Key Bank and M & T that it would repudiate. It says that there was no reason why the RTC could not have immediately repudiated all of the leases at that time or at least deferred the vacancy date for the small portion of space it needed for a few months.

In support of this conclusion, plaintiff refers to the testimony of the RTC officials who were on the scene at the time. John Feil, who was Field Site Manager from January 26, 1990 until March 1, 1991, when asked how the banks' election to put back the leases impacted on the RTC's decision to·repudiate, said: "Well obviously the RTC has no use for the property, you know." Tr. at 183. While employed by the RTC, he never received training on when leases should be repudiated. He could not explain why there was a three-month delay after repudiation.

Mark Warren, the RTC staff attorney in Buffalo from January 1990 until June 1991, said: "The leases only had utility to the assuming institution.... [W]hen both Key and M & T indicated that they did not need these leases it was a clear decision that they be repudiated." Tr. at 197. He said that the RTC had the ability to repudiate leases which it considered burdensome but acknowledged that the RTC had no rules defining "reasonableness." Mr. Warren authored the letter of repudiation signed by field manager Gary Clayton. Warren further testified that once the RTC received the notices from Key and M & T, "it was a fairly clear no-brainer that the leases would be repudiated because the assuming banks, Key and M & T, had no use for them." Tr. at 198. Mr. Warren repeatedly used the term "no-brainer" which according to Warren meant that when the RTC learned of the banks' notice, the decision to repudiate was simple. That is, "little thought" was required to make this decision. Tr. at 877. In spite of these statements, he thought that a 90 day period after December 28 would be reasonable.

In contrast to Mr Warren's testimony, David Oesterheld, who was an operations specialist working for the Field Site Manager, thought that the rule of thumb for repudiation was 90 days after the creation of the receivership. Approval of higher authority was not necessary, but it should be within a reasonable period after the start of the receivership.

Dominic Liberatore, the RTC Senior Attorney in the Real Estate Section, testified "If any acquirer doesn't want the property and puts them back to us the extent I believe of our analysis is if the acquirer doesn't want it we don't want it and we repudiate that." Tr. at 294. Liberatore stated: "[s]o once the lease comes back to us it will then be as a matter of course repudiated." Tr. at 293.

Gary Clayton followed John Feil as Field Site Manager in February 1991 and was the manager in March when the leases were repudiated. The letter of repudiation was prepared by Mark Warren, the on-site attorney for the RTC. Mr. Clayton said that he did not know why he signed the letter but acknowledged "[t]hat if the acquiring institutions did not exercise their options then the RTC would repudiate the leases." Tr. at 356. He was asked if that was always the case as a general policy of RTC to which he responded, "As far as I know it is." *Id.* Apparently neither Mr. Clayton nor any of the other local managers or attorneys were advised by their superiors in the RTC as to when a lease should be repudiated.

## *DISCUSSION*

The issue before this court is whether the RTC failed to repudiate the five leases between Old Empire and Central Buffalo within a "reasonable period" as directed by 12 U.S.C. § 1821(e), FIRREA.

Both parties agree that the leading case governing this issue is *1185 Avenue of the Americas v. RTC,* 22 F.3d 494 (2d Cir.1994). In *1185 Avenue,* the Second Circuit held that the RTC repudiated the leases in a "reasonable period" because the repudiation was made 92 days after the RTC was named receiver. The OTS found the bank insolvent and named the RTC as conservator on August 30, 1990. On July 19, 1991, the RTC sold the bank to seven "acquiring" institutions. On this same day, the OTS then named the RTC as receiver. Similar to the case at bar, the acquiring institutions had 90 days to decide whether or not they wanted to assume certain leases. On August 16, 1991, less than one month later, the acquiring institutions informed the RTC that they had elected not to exercise the option on the leases. Then, on October 18, 1991, 63 days later, the RTC notified the lessor that it would repudiate the leases effective February 29, 1992. The RTC's repudiation on

October 18, 1991, was about 91 days after the RTC was named receiver. The RTC paid for the leases through June 30, 1992.

*1185 Avenue* is similar to the case at bar in many respects. First, in both cases, the RTC was named conservator well before it was named receiver. From *1185 Avenue*, the Second Circuit held that a "reasonable period" under 12 U.S.C. § 1821(e) begins when the RTC is named receiver. *1185 Avenue*, 22 F.3d at 496. Second, in both cases, the acquiring institutions had 90 days to decide whether or not they wanted to assume the existing lease. However, in *1185 Avenue*, the acquiring institutions put back the leases in approximately 28 days, while in this case, M & T and Key did not put back the leases until 80 and 83 days later, respectively. In *1185 Avenue*, the RTC took 63 days to repudiate, while in this case, the RTC took almost 100 days to repudiate.

Two other cases are also similar and helpful to the court. First, in *RTC v. Cedar-Minn Building Ltd. Partnership*, 956 F.2d 1446 (8th Cir.), *cert. denied*, 506 U.S. 830, 113 S.Ct. 94, 121 L.Ed.2d 56 (1992), the RTC sold the insolvent bank's assets to the acquiring institutions and repudiated the leases only 24 days after being named receiver. The Eighth Circuit held that the repudiation was timely.

While the RTC repudiated only 24 days after it was appointed receiver, the acquiring institutions in *CedarMinn* did not have the option to take over the pre-existing leases as they did here. In *CedarMinn*, however, the Eighth Circuit discusses what is meant by the term "reasonable period." The court stated that "[t]he amount of time that is reasonable must be determined according to the circumstances of each case." *Cedar-Minn*, 956 F.2d at 1455. Furthermore, the court reviewed the legislative history and noted that while both the President's bill and the House bill initially set the repudiation period at 90 days, "the final statute eliminated the express 90–day restriction, apparently concluding that RTC ought to be given some flexibility." *Id.* at 1455 n. 13. Since Cedar-Minn was not prejudiced by the RTC's delay of 24 days, the Eighth Circuit held the repudiation timely.

Second, in *RTC v. United Trust Fund, Inc.*, 57 F.3d 1025 (11th Cir.1995), the facts are also similar. On February 1, 1990, the OTS found Old Pioneer Bank insolvent and appointed the RTC as conservator. On March 8, 1990, OTS appointed the RTC receiver of Old Pioneer and created New Pioneer and appointed the RTC as conservator of New Pioneer. On February 28, 1991, the RTC entered into an agreement with Great Western, an acquiring institution, giving Great Western a 90–day option to take over the lease. On June 19, 1991, about 111 days later, Great Western sent the RTC a letter saying that it did not want to exercise its option on the lease. Two days later, June 21, 1991, the RTC, as receiver, sent a letter repudiating the lease effective July 1, 1991. The Eleventh Circuit held that the repudiation, which was 113 days after the RTC was named receiver, was timely.

In both *1185 Avenue* and *United Trust Fund*, the Second and Eleventh Circuits, respectively, started the clock ticking from the day that the RTC was appointed receiver even though in each case the acquiring institutions had 90 days to decide whether or not to assume the leases. In *1185 Avenue*, the court found that repudiating within 92 days was within a "reasonable period." In *United Trust Fund*, repudiating within 113 days was within a "reasonable period." Here, the court must decide whether repudiating within 181 days was within a "reasonable period."

In view of the opinions expressed by the RTC's own managers, there appears to be no reason why the leases could not have been repudiated at a much earlier date. The RTC could have prepaid the rent for some period as it finally did in March or entered into negotiation with plaintiff about the terms of an extension so that the work of deconversion could proceed in a feasible manner. Based on the circumstances, the roughly 100–day delay before repudiation was not within a "reasonable period."

## CONCLUSION

The court finds that defendants violated 12 U.S.C. § 1821(e) when they failed to repudiate the five leases between Old Empire and

Central Buffalo within a "reasonable period." While the court has decided the question of liability, it has not addressed the question of damages. Although the trial was focused on liability, much evidence relating to damage was received. If the plaintiff has anything further to offer on the damage issue, it shall have the opportunity to do so. If it does not, both sides shall file proposed findings and memoranda on the issue of damages. To determine what course to follow, a telephone conference shall be held on December 2, 1998, at 3:30 p.m.

So ordered.